DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

Filing # 132644247 E-Filed 08/13/2021 01:37:44 PM

IN THE CIRCUIT COURT OF THE
EIGHTEENTH JUDICIAL CIRCUIT, IN
AND FOR SEMINOLE COUNTY,
FLORIDA
CASE NO.: 2018CA003330

THE BANK OF NEW YORK MELLON F/K/A THE
BANK OF NEW YORK AS TRUSTEE FOR THE
CERTIFICATE HOLDERS CWABS, INC. ASSET-
BACKED CERTIFICATES, SERIES 2006-23
     Plaintiff,

vs.

BEVERLY MULLINGS; UNKNOWN SPOUSE OF
BEVERLY MULLINGS; UNKNOWN HEIRS OF
BEVERLY MULLINGS; JUDGE THOMAS
PHILLIPS III AS TRUSTEE ON BEHALF OF
MULLINGS LAND TRUST; BEVERLY
MULLINGS AS SOLE BENEFICIARY OF THE
MULLINGS LAND TRUST; NEWFOUNDLAND
PROPERTIES; TIMACUAN COMMUNITY
SERVICES ASSOCIATION, INC.; UNKNOWN
TENANT IN POSSESSION OF SUBJECT
PROPERTY;
     Defendants.

## VERIFIED AMENDED COMPLAINT FOR FORECLOSURE OF MORTGAGE

Plaintiff, THE BANK OF NEW YORK MELLON F/K/A THE BANK OF NEW YORK AS

TRUSTEE FOR THE CERTIFICATE HOLDERS CWABS, INC. ASSET-BACKED CERTIFICATES,

SERIES 2006-23, sues the Defendants, BEVERLY MULLINGS; UNKNOWN SPOUSE OF BEVERLY

MULLINGS; UNKNOWN HEIRS OF BEVERLY MULLINGS; JUDGE THOMAS PHILLIPS III AS

TRUSTEE ON BEHALF OF MULLINGS LAND TRUST; BEVERLY MULLINGS AS SOLE

BENEFICIARY OF THE MULLINGS LAND TRUST; NEWFOUNDLAND PROPERTIES;

TIMACUAN COMMUNITY SERVICES ASSOCIATION, INC.; DARRIN C. LAVINE; and alleges:

## MORTGAGE FORECLOSURE

1.     This is an action to foreclose a mortgage on real property in SEMINOLE County,

Florida.

2.     The Court has jurisdiction over the subject matter.

3.     On or about October 18, 2006, Defendant, BEVERLY MULLINGS, executed and

delivered a promissory note. A copy of the note is attached hereto as Exhibit "A".

CR12203-18/nns                     1

*** E-FILED: GRANT MALOY, CLERK OF CIRCUIT COURT SEMINOLE COUNTY, FL 08/13/2021 01:37:43 PM.****

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

4.　　　On or about October 18, 2006, Defendant, BEVERLY MULLINGS, executed and delivered a mortgage securing payment of the note to COUNTRYWIDE HOME LOANS, INC.. The mortgage was recorded on November 20, 2006, in Official Records Book 06490, at Page 0634, of the Public Records of SEMINOLE County, Florida, and encumbered the property described in the mortgage then owned by and in possession of the mortgagor, a copy of the mortgage being attached hereto as Exhibit "B." The Mortgage and Note (collectively "Loan Documents") were modified pursuant to an Unrecorded Loan Modification Agreement executed February 26, 2009. A copy of the Loan Modification Agreement is attached hereto as Exhibit "C".

5.　　　That the Mortgage was subsequently assigned from MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED, AS NOMINEE FOR COUNTRYWIDE HOME LOANS, INC. to THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATE HOLDERS CWABS, INC. ASSET-BACKED CERTIFICATES, SERIES 2006-23 by virtue of an Assignment of Mortgage recorded May 29, 2008 in Official Records Book 07000, Page 1680 of the Public Records of SEMINOLE County, Florida. A copy of the Assignment has been attached hereto as Exhibit "D".

6.　　　THE BANK OF NEW YORK was renamed to THE BANK OF NEW YORK MELLON. The Institution History for THE BANK OF NEW YORK as maintained by the online database of the Federal Financial Institutions Examination Council at **www.ffiec.gov.** is attached hereto as Exhibit "E".

7.　　　The mortgage of the Plaintiff is a lien superior in dignity to any prior or subsequent right, title, claim, lien or interest arising out of mortgagor(s) or the mortgagor(s)' predecessor(s) in interest.

8.　　　Plaintiff is the holder of the original note secured by the mortgage and is entitled to foreclose pursuant to Florida Statute 673.3011(1).

9.　　　CARRINGTON MORTGAGE SERVICES, LLC is the loan servicer for this particular loan. Plaintiff has delegated CARRINGTON MORTGAGE SERVICES, LLC the authority to service the loan on its behalf pursuant to a (Limited) Power of Attorney, attached hereto as Exhibit "F".

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

10.     Defendant(s) have defaulted under the note, mortgage, and any alleged modifications thereof, hereinafter referred to as "the Loan Documents", by failing to pay the payment due as of September 1, 2013, and all subsequent payments.

11.     Plaintiff declares the full amount payable under the Loan Documents to be due.

12.     Defendant(s) owe Plaintiff **$453,687.76,** that is due and owing on principal on the Loan Documents, plus interest from and after August 1, 2013, and title search expenses for ascertaining necessary parties to this action, pursuant to the documents attached, except for those defendants who have been discharged in bankruptcy.

13.     In order to protect its security, the Plaintiff may have advanced and paid Ad Valorem Taxes, premiums on insurance required by the mortgage and other necessary costs, or may be required to make such advances during the pendency of this action. Any such sum so paid will be due and owing to the Plaintiff.

14.     The property is now owned by Defendant, BEVERLY MULLINGS, and the record legal title to said mortgaged property is now vested in Defendant, BEVERLY MULLINGS.

15.     All conditions precedent to the acceleration of this mortgage note and to foreclosure of the mortgage have occurred.

16.     Plaintiff is obligated to pay Plaintiff's attorneys a reasonable fee for their services. Plaintiff is entitled to recover its attorneys' fees pursuant to the express terms of the note and mortgage.

17.     Plaintiff alleges that the claims of the remaining Defendants are secondary, junior, inferior and subject to the prior claim of Plaintiff.

18.     Defendant, UNKNOWN SPOUSE OF BEVERLY MULLINGS, may claim an interest in the subject property by virtue of marriage to BEVERLY MULLINGS. Said interest, if any, is subject and inferior to the lien of Plaintiff's Mortgage.

19.     Defendant, UNKNOWN HEIRS OF BEVERLY MULLINGS, may claim an interest in the subject property by virtue of any possible interest, but the interest, if any, is subject and inferior to the lien of Plaintiff's Mortgage.

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

20. Defendant, JUDGE THOMAS PHILLIPS III AS TRUSTEE ON BEHALF OF MULLINGS LAND TRUST, may claim an interest in the subject property by virtue of Assignment to Deed in Trust recorded February 26, 2013, in the Public Records of SEMINOLE, Florida County in Official Records Book 07976, at Page 0436. Said interest, if any, is subject and inferior to the lien of Plaintiff's Mortgage.

21. Defendant, BEVERLY MULLINGS AS SOLE BENEFICIARY OF THE MULLINGS LAND TRUST, may claim an interest in the subject property by virtue of Assignment to Deed in Trust recorded February 26, 2013, in the Public Records of SEMINOLE County, Florida in Official Records Book 07976, at Page 0436. Said interest, if any, is subject and inferior to the lien of Plaintiff's Mortgage.

22. Defendant, NEWFOUNDLAND PROPERTIES, may claim an interest in the subject property by virtue of defective Warranty Deed recorded January 11, 2018, in the Public Records of SEMINOLE County, Florida in Official Records Book 9056, at Page 1851 (a Trust Affidavit was not executed or recorded along with attempted conveyance and Defendant is also not registered as a corporate entity with the State of Florida and/or identified as a Trust). Said interest, if any, is subject and inferior to the lien of Plaintiff's Mortgage.

23. Defendant, TIMACUAN COMMUNITY SERVICES ASSOCIATION, INC., may claim an interest in the subject property by virtue of unpaid assessments, dues or any other possible interests. Said interest, if any, is subject and inferior to the lien of Plaintiff's Mortgage.

24. Defendant, DARRIN C. LAVINE, may claim an interest in the subject property by virtue of Corrective Warranty Deed recorded June 21, 2018, in the Public Records of SEMINOLE County, Florida in Official Records Book 9157, at Page 0866. Said interest, if any, is subject and inferior to the lien of Plaintiff's Mortgage.

25. Any and all unknown parties claiming by, through, under, and against the herein named individual defendant(s) who are not known to be dead or alive, whether said unknown parties may claim an interest as spouses, heirs, devisees, grantees, or other claimants are joined as defendants herein. The claims of said defendants are subordinate, junior, and inferior to the interest of the Plaintiff.

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

WHEREFORE, Plaintiff demands judgment foreclosing the mortgage, for costs (and, when applicable, for attorneys' fees), and, if the proceeds of the sale are insufficient to pay plaintiff's claim, a deficiency judgment, that the Court ascertain the amount due to Plaintiff for principal and interest on the Mortgage and Note and for late charges, abstracting, taxes, expenses and costs, including attorney's fees, plus interest thereon; that if the sums due Plaintiff under the Mortgage and Note are not paid immediately, the Court foreclose the Mortgage and the Clerk of the Court sell the Property securing the indebtedness to satisfy the Plaintiff's mortgage lien in accordance with the provisions of Florida Statutes §45.031; that the rights, title and interest of any Defendant, or any party claiming by, through, under or against any Defendant named herein or hereinafter made a Defendant be forever barred and foreclosed; that the Court appoint a receiver of the Property and of the rents, issues, income and profits thereof, or in the alternative, order sequestration of rents, issues, income and profits pursuant to Florida Statutes §697.07 (2006); and that the Court retain jurisdiction of this action to make any and all further orders and judgments as may be necessary and proper, including

the issuance of a writ of possession and the entry of a deficiency judgment decree, when and if such deficiency decree shall appear proper, if borrower(s) has not been discharged in bankruptcy.

## VERIFICATION OF FORECLOSURE COMPLAINT

Under penalty of perjury, I declare that I have read the foregoing, and the facts alleged therein are true and correct to the best of my knowledge and belief.

**DATED this** ___ **day of** ___8/10/2021___ **, 2021**
8/10/2021

> CARRINGTON MORTGAGE SERVICES, LLC
> as Servicer and Attorney in Fact for THE BANK
> OF NEW YORK MELLON F/K/A THE BANK
> OF NEW YORK AS TRUSTEE FOR THE
> CERTIFICATE HOLDERS CWABS, INC.
> ASSET-BACKED CERTIFICATES, SERIES
> 2006-23
>
> By: _____ Elizabeth Gonzales
> Printed Name: _____
> Title: ___Default Fulfillment Manager___
> Date: _____8/10/2021_____

RE:   Borrower:   BEVERLY MULLINGS
        Address:   829 EAGLE CLAW CT, LAKE MARY, FL 32746-4881
        File #:   CR12203-18

**I HEREBY CERTIFY** that a true and correct copy of the forgoing has been furnished to all parties on the attached service list by regular U.S. mail or by email to the counsel of records designated email address for service of pleadings on this ___13___ day of ___August___ 2021.

DATED this _13_ day of _August_, 2021.

> **VAN NESS LAW FIRM, PLC**
> 1239 E. Newport Center Drive, Suite 110
> Deerfield Beach, Florida 33442
> Ph: (954) 571-2031
> PRIMARY EMAIL: **pleadings@vanlawfl.com**
>
> By: ___/s/ Maya Rubinov, Esq.___
> ☒ Maya Rubinov, Esq.
> Bar Number: 99986

**Pursuant to the Fair Debt Collection Practices Act you are hereby advised that a portion of our practice involves the collections of debts and any information obtained may be used for that purpose.**

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

<u>**CASE NO.: 2018CA003330**</u>
<u>**SERVICE LIST**</u>

MICHAEL J. STITES, ESQ.
P.O. BOX 1987
ORLANDO, FL 32802
*ATTORNEY FOR BEVERLY MULLINGS INDIVIDUALLY AND AS BENEFICIARY,*
*NEWFOUNDLAND PROPERTIES, AND JUDGE PHILLIPS II AS TRUSTEE*
EMAIL: michaeljohn@stiteslaw.com

ANTHONY N. LEGENDRE, II, ESQ.
LAW OFFICES OF LEGENDRE & LEGENDRE, PLLC
P.O. BOX 948599
MAITLAND, FL 32794-8599
**ATTORNEY FOR BEVERLY MULLINGS, JUDGE THOMAS PHILLIPS AS TRUSTEE o/b/o**
**MULLINGS LAND TRUST, and NEWFOUNDLAND PROPERTIES**
Primary E-mail: anthonylegendre@live.com
Secondary E-mail: anthony@law-legends.com

JOHNNY JACKSON
121 MAYFIELD DR.
SANFORD, FL 32771
*UNKNOWN SPOUSE OF BEVERLY MULLINGS*

ERIK WHYNOT, ESQ.
2180 SEMINOLA BLVD
CASSELBERRY, FL 32707
*ATTORNEY FOR TIMACUAN COMMUNITY SERVICES ASSOCIATION, INC.*
EMAIL: ewhynot@whynotlaw.com

CR12203-18

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B



# EXHIBIT "A"

Prepared by. AKEEM KENNEDY

# ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| OCTOBER 18, 2006 | LAKE MARY | FLORIDA |
|---|---|---|
| [Date] | [City] | [State] |

829 EAGLE CLAW CT, LAKE MARY, FL 32746-4881
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 410,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
COUNTRYWIDE HOME LOANS, INC.
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    7.125  %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay Principal and interest by making a payment every month.

I will make my monthly payment on the first      day of each month beginning on
DECEMBER 01, 2006    . I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  NOVEMBER 01, 2046    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 660694, Dallas, TX 75266-0694
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 2,585.18     . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid Principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first      day of NOVEMBER, 2008  , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX & THREE-QUARTERS    percentage point(s) (    6.750  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

**FLORIDA ADJUSTABLE RATE NOTE - LIBOR INDEX - Single Family**
**● BC - ARM Note**
2D164-FL (12/05)(d)    Page 1 of 3

## ORIGINAL



The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 8.625 % or less than 7.125 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE & ONE-HALF percentage point(s) ( 1.500 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 14.125 % or less than 7.125 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid Principal is known as a "Full Prepayment." A prepayment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Partial or Full Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a prepayment if I have not made all the monthly payments due under this Note.

Subject to the Prepayment Penalty specified below, I may make a Full Prepayment or Partial Prepayments of my obligation. The Note Holder will use all of my prepayments to reduce the amount of Principal that I owe under the Note. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

☐ I may prepay this Note in full at any time without penalty.

☒ If within the first TWENTY FOUR months after the execution of the Note, I make any prepayment(s) within any 12-month period, the total of which exceeds 20 percent (20%) of the original principal amount of this loan, I will pay a prepayment penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds 20 percent (20%) of the original principal amount of the loan.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a Partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

*[initials]*

**ORIGINAL**

LOAN

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. DOCUMENTARY TAX

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____
BEVERLY MULLINGS                                    -Borrower

_____
-Borrower

_____
-Borrower

_____
-Borrower

*[Sign Original Only]*

PAY TO THE ORDER OF

WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC.

BY: *Michele Sjolander*

MICHELE SJOLANDER
EXECUTIVE VICE PRESIDENT

ORIGINAL

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

# EXHIBIT "B"



After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
This document was prepared by:
AKEEM KENNEDY
COUNTRYWIDE HOME LOANS, INC.

MARYANNE MORSE, CLERK OF CIRCUIT COURT
SEMINOLE COUNTY
BK 06490 Pgs 0634 - 649; (16pgs)
CLERK'S # 2006184146
RECORDED 11/20/2006 02:55:21 PM
MTG DUC TAX 1,435.00
INTANG TAX 820.00
RECORDING FEES 137.50
RECORDED BY t holden

2375 N GLENVILLE DR
RGV-B844-2
RICHARDSON
TX 75082

————————————— [Space Above This Line For Recording Data] —————————————

## MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated OCTOBER 18, 2006 , together with all Riders to this document.
(B) "Borrower" is
BEVERLY MULLINGS, INDIVIDUALLY

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is
COUNTRYWIDE HOME LOANS, INC.
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
4500 Park Granada MSN# SVB-314, Calabasas, CA 91302-1613
(E) "Note" means the promissory note signed by Borrower and dated OCTOBER 18, 2006 . The Note states that Borrower owes Lender
FOUR HUNDRED TEN THOUSAND and 00/100

Dollars (U.S. $ 410,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than NOVEMBER 01, 2046 .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 11

-6A(FL) (0005)    CHL (08/05)(d)    VMP Mortgage Solutions, Inc. (800)521-7291    Form 3010 1/01
CONVVA



DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

DOC ID #: ▮▮▮▮▮▮▮

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

| COUNTY | of | SEMINOLE | : |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.



DOC ID #▮▮▮▮▮▮▮

Parcel ID Number: 20300550600000340

which currently has the address of

629 EAGLE CLAM CT, LAKE MARY

[Street/City]

Florida 32746-4881 ("Property Address"):

[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

-6A(FL) (0005)     CHL (08/05)          Page 3 of 11          Form 3010 1/01

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

DOC ID #:

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

-6A(FL) (0005)    CHL (08/05)    Page 4 of 11    Form 3010 1/01

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-458158A78238

DOC ID #:

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

DOC ID #: ▮▮▮▮▮▮▮▮

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

DOC ID #: ▓▓▓▓▓▓▓▓▓▓▓

amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

DOC ID # ██████████

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BAT7823B

DOC ID #:

Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to

Initials: (illegible)

@-6A(FL) (0005)    CHL (08/00)    Form 3010 1/01

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

DOC ID #:

which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

-6A(FL) (0005)    CHL (08/05)    Page 10 of 11    Form 3010 1/01

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

DOC ID #: ████████████

24. **Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. **Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____          _____ (Seal)
MILENA B. McGOVERN                        BEVERLY MULLINGS              -Borrower
                                          829 EAGLE CLAW CT
                                          LAKE MARY, FL 32746-4861      (Address)

_____          _____ (Seal)
Michelle Imbert                                                        -Borrower

                                          _____ (Address)

                                          _____ (Seal)
                                                                       -Borrower

                                          _____ (Address)

                                          _____ (Seal)
                                                                       -Borrower

                                          _____ (Address)

STATE OF ~~FLORIDA~~ New York,  Westchester  County ss:
The foregoing instrument was acknowledged before me this 18th day of Oct. 2006 by

Beverly Mullings
_____
_____
_____

who is personally known to me or who has produced Florida DL as identification.

_____
Notary Public
Milena B. McGovern, NOTARY PUBLIC
State of New York, County of Dutchess
Comm. No. 01MC6121215
Valid From 01/10/2005 — 01/10/2009

-6A(FL) (0008)      CHL (08/05)          Page 11 of 11              Form 3010  1/01

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

## EXHIBIT A
## LEGAL DESCRIPTION

All that certain land with all the buildings and improvements thereon situate in Seminole County, Florida, viz:

Lot 34, Timacuan Unit 17, according to plat thereof as recorded in Plat Book 41, Page(s) 89 and 90, of the Public Records of Seminole County, Florida.

For title reference, see Deed recorded in Book 05611, Page 0371 of the Official Records of Seminole County.

Tax/ Parcel ID#: 05-20-30-506-0000-0340

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

DOC ID #: ▓▓▓▓▓▓▓▓▓▓▓

# ADJUSTABLE RATE RIDER
(LIBOR Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this EIGHTEENTH day of OCTOBER, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to COUNTRYWIDE HOME LOANS, INC.

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

829 EAGLE CLAW CT, LAKE MARY, FL 32746-4881

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

MULTISTATE ADJUSTABLE RATE RIDER - LIBOR INDEX - Single Family
CONV
● BC - ARM Rider
1U193-US (12/05)(d)                    Page 1 of 4



DOC ID #: ▮▮▮▮▮▮▮▮▮▮

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of 7.125 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of NOVEMBER, 2006 , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX & THREE-QUARTERS percentage point(s) ( 6.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 8.625 % or less than 7.125 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE & ONE-HALF percentage point(s) ( 1.500 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 14.125 % or less than 7.125 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

CONV
● BC - ARM Rider
1U183-U8 (12/05)                    Page 2 of 4

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

DOC ID #: █████████

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CONV
● BC - ARM Rider
1U193-U8 (12/05)                    Page 3 of 4

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

DOC ID #: ▮▮▮▮▮▮▮▮▮▮

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
BEVERLY MULLINGS                                    - Borrower

_____ (Seal)
                                                   - Borrower

_____ (Seal)
                                                   - Borrower

_____ (Seal)
                                                   - Borrower

CONV
● BC - ARM Rider
1U193-US (12/05)                    Page 4 of 4

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

# EXHIBIT "C"



**HOME LOANS**

Attn: Home Retention Division
Countrywide Modification
100 Beecham Drive
Pittsburgh, PA 15205



**Notice Date:** January 30, 2009

**Account No.:**

BEVERLY MULLINGS
23 Spring Ave
Bergenfield, NJ 07621

**Property Address:**
829 EAGLE CLAW CT
LAKE MARY, FL 32746

**THIS IS AN IMPORTANT NOTICE REGARDING YOUR LOAN.
PLEASE BE SURE TO READ THIS ENTIRE LETTER CAREFULLY.**

Dear BEVERLY MULLINGS,

Countrywide Home Loans has recently announced a Homeownership Retention Program designed to help our valued customers who may be having difficulty making their mortgage payments. That's why we're pleased to inform you that you are eligible[1] for our Homeownership Retention Program, and the following options may be available to you:

- Interest-rate reduction
- Interest-only payments for a ten (10) year period
- Resolution of past due amount

In order to take advantage of the interest rate reduction, interest-only payments for a ten (10) year period and resolution of past due amount you must agree to the enclosed modification agreement and return it to us as indicated below.

The enclosed modification will reduce your interest rate to 4.875%,[2] which will result in a new payment amount of $1,843.11.[3] This rate will be fixed for a period of one year. It will take effect March 1, 2009 and will continue until February 28, 2010. At the end of one year, your interest rate will increase; however, the interest rate increase will not increase your total principal (if applicable) and interest payments by more than 7.5% of total scheduled payments of principal (if applicable) and interest from the prior year. Your interest rate will continue to change annually thereafter, subject to a maximum interest rate of 7.125%.

Accepting the enclosed modification also resolves your past due amount of $42,626.34 as of January 27, 2009. The enclosed modification is one of two ways you can resolve your past due amount as follows:

**1. If you are able to pay your past due amount:**
If you can pay back your past due amount and do not wish to add them to your balance, please contact us at 800.669.6650 to make arrangements to pay this amount and receive new modification documents.

**2. If you are NOT able to pay your past due amount:**
Read and sign the enclosed modification. It will authorize us to add the unpaid amount through

---

[1] Your eligibility is based upon information you provided to us and may be subject to validation.
[2] This rate was determined through discussions between Countrywide and various state attorneys general across the country.
[3] This payment is subject to change if your escrow payment changes.



DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

February 28, 2009 to the principal balance of your loan. If you agree to the terms of this modification, your monthly principal and interest payment will be higher than it would have been had the past due amount not been added to your balance.

---

**TO ACCEPT THE ENCLOSED MODIFICATION, HERE'S WHAT YOU NEED TO DO**

1) Carefully review all documentation enclosed. We have outlined important legal terms of this change and notices on the following pages. It is very important that you read and understand these terms.

2) Sign and date the enclosed modification document in the presence of a notary.[4] The notary acknowledgment must be in recordable form. All parties who own an interest in the property must sign the modification agreement as their name appears on the enclosed agreement.

3) Include any and all of the following income information applicable to your situation with your signed and notarized loan-modification agreement:
   o Copies of two recent (within the past 60 days) paystubs for each income earner, and/or
   o Copies of your past three bank statements if:
      ▪ You are self-employed, or
      ▪ If you have any other sources of income such as government, retirement or disability benefits, child support or alimony payments, rental or boarder income, etc.

4) Return the signed documents to us in the pre-paid FedEx envelope no later than March 1, 2009 in order for it to take effect. Be sure to use the address label provided.

We appreciate that some of these terms may be difficult to understand. If you have any questions about this program, please contact us at 877.665.6866. Our dedicated Loan Consultants can be reached from 8:00 AM until 9:00 PM CT Monday through Friday, and 8:00 AM until 3:00 PM CT on Saturday. You can also learn more about our Homeownership Retention Program by visiting us online at www.countrywide.com/hope.

We are committed to providing you the help you need to remain in your home. Please take advantage of this offer by completing the enclosed forms, or by calling us to see how we can help you.

Thank you,

The Countrywide Customer Service Team

---

[4] If this document is being executed in California, you must use the California All Purpose Acknowledgment. It will be utilized by a notary of the state of California in place of the notary section contained in the Loan Modification Agreement.



DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

## IMPORTANT TERMS

If you agree to the terms of the enclosed modification and return it as indicated, the interest rate reduction being offered will take effect March 1, 2009 and will continue until February 28, 2010 which means your new lower payment will be reflected on your April 1, 2009 statement. As explained above this payment is subject to change annually subject to the terms of the enclosed modification. After the ten-year period, you will be required to make principal and interest payments for the remaining term of the loan.

While, during the interest-only period, you are not required to make payments of principal, we nevertheless encourage you to remit more when possible to reduce the likelihood of a significant payment increase at the end of ten years. Please see the additional Payment Choices in your interest-only monthly statement for ways to help you pay down principal. Paying down principal now will help to reduce the amount of interest you currently owe reducing your new Interest-Only payment, and will reduce your new monthly payment of principal and interest that will be due at the end of the Interest-Only period. By signing and returning the documents to us you are acknowledging your acceptance and understanding of the terms of the modification.

The following figures show your delinquent balance as of February 28, 2009. The total amount and breakdown of delinquent amounts that would be added to your loan under the terms of the enclosed modification are as follows:

| | |
|---|---|
| Interest: | $43,109.76 |
| Fees*: | $2,287.00 |
| Escrow: | $0.00 |
| Total: | $45,396.76 |

\*    Fees may include but are not limited to property inspection fees, property preservation fees, legal fees, appraisal fess, BPO fees, title report fees, recording fees, and/or subordination fees.

Please note that this modification will bring your loan current; however, it may increase your monthly payment.

Remember to include copies of your paychecks and/or bank statements along with your loan modification documents in the Federal Express envelope by the date indicated above.

Please note that this offer is contingent upon verification of your income. Even if you sign and return the loan modification documents; *this modification will not take effect if we are not able to verify your income.*

We will not initiate or advance foreclosure while determining your eligibility and willingness to accept the Homeownership Retention Program. However, this letter does not stop, waive or postpone any collection actions, or credit reporting actions with respect to your loan.

Countrywide is required by law to inform you that this communication is from a debt collector.



## RATE CHANGE NOTICE
## HOW WE CALCULATE YOUR NEW MONTHLY PAYMENT

This program involves three key components to help homeowners stay in their homes: interest-rate reduction, interest-only payments, and resolution of delinquent balances.

Here's how we calculated your new monthly payment under the terms of the enclosed modification agreement:

First, we determined your new interest rate.

|  | Current | New |
|---|---|---|
| Loan Index | 3.0162% | N/A * |
| Margin | N/A | N/A |
| Total | N/A | N/A |
| Rounding | N/A | N/A |
| Actual Rate | 8.625% | 4.875% |

\* N/A: The new rate is an agreed to interest rate and is not based on an index and margin.

Then we determined your new payment amount.

| | |
|---|---|
| New Interest Rate | 4.875% |
| Anticipated Principal Balance[5] | $453,687.76 |
| Remaining Term as of | March 1, 2009    452 months |
| New Interest payment | $1,843.11 |
| New Payment Effective | April 1, 2009 |

If you have an escrow account, this notice does not address any changes to your escrow payment. To determine your new monthly payment please add your escrow payment to the amount indicated above. Please refer to your monthly statement for information regarding your current escrow payment.

---

[5] Anticipated Principal Balance is the unpaid principal that you are expected to owe as of the first payment due under the enclosed modification agreement.



```
RECORDING REQUESTED BY:
Countrywide Home Loans Servicing LP
Attn: Home Retention Division
100 Beecham Drive
Pittsburgh, PA 15205
```

Doc ID # ▮▮▮▮▮▮▮▮▮▮▮

-------------------------------------SPACE ABOVE THIS LINE FOR RECORDER'S USE-------------------------------------

## LOAN MODIFICATION AGREEMENT
### (Step Rate)

This Loan Modification Agreement ("Agreement"), made this 30th day of January, 2009, between BEVERLY MULLINGS (the "Borrower(s)") and Countrywide Home Loans Servicing LP (the "Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), dated the 18th day of October, 2006 (2) the Note and Adjustable Rate Rider and secured by, the Security Instrument, and (3) any prior agreements or modifications in effect relative to the Note and Security Instrument which covers the real property described in the Security Instrument and defined therein as the 'Property', located at 829 EAGLE CLAW CT, LAKE MARY, FL 32746, collectively the prior documents shall be referred to herein as the "Note and Security Instrument".

The real property described being set forth as follows:

### SAME AS IN SAID SECURITY INSTRUMENT

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note and Security Instrument):

1. **Amount of Borrower's Unpaid Principal Balance**

   As of the 1st day of March, 2009, the amount payable under the Note and Security Instrument (the "Unpaid Principal Balance") is U.S. $453,687.76, consisting of the amount(s) owed by the Borrower to the Lender and which may include, but are not limited to, any past due principal payments, interest, escrow payments, fees and/or costs ("Unpaid Amounts") which you have agreed shall be capitalized (added to the amount you originally borrowed) as one of the terms of this agreement. Any late/delinquency fees associated with overdue loan payments remaining unpaid as of the date immediately before this modification have been be waived and not included in this capitalization. The Borrower understands that capitalizing the Unpaid Amounts may result in the Borrower paying more interest over the life of the loan.

2. **Borrower's Promise to Pay**

   The Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of the Lender. If on the 1st day of November, 2046 (the "Maturity Date"), the Borrower still owes amounts under the Note and Security Instrument, as amended by this Agreement, the Borrower will pay these amounts in full on the Maturity Date.

   The Borrower will make such payments at 7105 Corporate Drive, (PTX-B-36), Plano, TX 75024 or at such other place as the Lender may require.

3. **Amount of Borrower's Initial Scheduled Monthly Payments**

   As of the 1st day of April, 2009, the scheduled monthly payment will be in the amount of U.S. $1,843.11. The scheduled monthly payment may change on that day of every twelfth month thereafter as described in Section 4 of this Loan Modification Agreement. The Lender will notify the Borrower prior to the date of change in the scheduled monthly payment. During the Interest-Only period, the amount of the monthly payment also may change if the Borrower makes voluntary prepayments of principal.

   **(A) Monthly Payment Changes**
   Changes in the monthly payment will reflect changes in the unpaid principal and in the interest rate that the Borrower must pay. The Lender will determine the changed amount of the monthly payment in accordance with Section 5 of this Loan Modification Agreement.

4. **Interest Rates**

   As of the 1st day of March, 2009, Borrower will pay interest at a yearly rate of 4.875%. Thereafter, the interest rate that Borrower will pay and the dates when the interest rate will change are set forth below.



**Interest Rate Increases.** The interest rate Borrower will pay will change as indicated below.

**Extended Interest Only Payment Period**     **Principal and Interest Payment Period**

| Change Date | Interest Rate | Change Date | Interest Rate |
|---|---|---|---|
| 03/01/2010 | 5.125% | 03/01/2019 | 7.125% |
| 03/01/2011 | 5.5% | 03/01/2020 | 7.125% |
| 03/01/2012 | 5.875% | 03/01/2021 | 7.125% |
| 03/01/2013 | 6.25% | 03/01/2022 | 7.125% |
| 03/01/2014 | 6.625% | 03/01/2023 | 7.125% |
| 03/01/2015 | 7% | 03/01/2024 | 7.125% |
| 03/01/2016 | 7.125% | 03/01/2025 | 7.125% |
| 03/01/2017 | 7.125% | 03/01/2026 | 7.125% |
| 03/01/2018 | 7.125% | 03/01/2027 | 7.125% |
| | | 03/01/2028 | 7.125% |

After the last Change Date, the interest rate shall remain the same until such time as the principal and interest due under the Note are paid in full.

**5. Monthly Payment Changes**

**(A) Change Dates**
Each date on which the interest rate changes is called a "Change Date."

**(B) Interest-Only Payments**
The first ten years following the execution of this Loan Modification Agreement are known as the "Interest-Only Period." On the first Change Date and continuing through the 11th Change Date (to the extent Section 4 provides for 11 or more rate changes), the amount of the new scheduled monthly payments will be determined by dividing the new interest rate by 12 and multiplying the result by the then unpaid principal. If the Borrower makes a voluntary prepayment of principal during the Interest-Only Period, the next monthly payment will be less. The lower monthly payment amount will be determined by dividing the new interest rate by 12 and multiplying it by the then unpaid principal. If the Borrower makes a voluntary prepayment of principal after the due date of a scheduled monthly payment, the prepayment amount will be credited immediately, but the reduction in the amount of the monthly payment may not be reflected on the billing statement until the following month.

**(C) Principal and Interest Payments**
On March 1, 2019 and on every Change Date thereafter, the Lender will determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that the Borrower is expected to owe at the Change Date in full on the Maturity Date at the new interest rate in substantially equal payments. The result of this calculation will be the amount of the new scheduled monthly payment.

**6. Impact of this Agreement on the New Interest-Only Payment and on the Amount of Interest Borrower Will Pay Over the Life of the Loan**

The Borrower understands that by agreeing to add the unpaid past-due payments, including unpaid and deferred interest, fees, and other costs (collectively "Unpaid Amounts") to the Unpaid Principal Balance, the added Unpaid Amounts accrue interest based on the interest rate in effect. The Borrower also understands that this means interest will now accrue on the unpaid interest, and that this would not happen without this Agreement.

The Borrower understands the result of this Agreement is to increase the amount of interest that will be owed over the term of the loan. This is because the amount of principal is higher and the interest due is recalculated because it is charged on that higher principal amount.

**7. Impact of this Agreement on Monthly Payments at the End of the Interest-Only Period — the First Principal and Interest Payment Due Date:**

After the Interest-Only Period ends, the Borrower understands the monthly payment will increase—even if the Borrower's interest rate stays the same—because the Borrower must start repaying the principal, as well as the interest, for the remainder of the loan term. Because this Agreement results in the Unpaid Amounts being added to principal, the amount of principal that is due with each monthly payment will also increase, which results in a bigger monthly payment. The Borrower also understands the need to plan for this increase in the amount of the monthly payment when the Interest-Only Period ends and that at that time the Borrower will no longer have the choice of paying only the Interest-Only monthly amount. The Borrower understands that the increase in the monthly payment amount at the First Principal and Interest Payment Due Date could be significant and result in a condition referred to as payment shock.

**8. Understanding the Monthly Statement During the Interest-Only Period**

The Borrower understands that the Interest-Only Monthly Statement during the Interest-Only Period will offer the Borrower more payment options than just the Interest-Only Payment. Although the Borrower's Interest-Only loan offers the freedom to pay only the Interest portion of the payment due each month for a specified period of time, the Borrower also understands he or she has the choice to pay additional amounts, which will assist the Borrower in paying down the principal balance. If the Borrower chooses to pay extra money beyond the Interest-Only payment amount in a given month, the Borrower understands this will reduce the principal owed. The next month, the Interest-Only payment amount the Borrower owes (assuming there has been no change in the interest rate on the Borrower's loan) will be lower. This is because the amount of principal is lower and the interest due is recalculated because it is charged on that lower principal amount. The Borrower understands that paying more and reducing principal can also mean that the Borrower will build equity in the home more quickly. The Borrower understands that the Amortized Payment Choice

and 15-Year Amortized Payment Choice shown on the Interest-Only monthly statement provide the Borrower with easy ways each month to select a payment that reduces the Borrower's principal. The Borrower may, however, pay any amount above the Interest-Only Payment amount.

**9. Effective of This Modification Agreement**

Nothing in this agreement shall be understood or construed to be a refinance, satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and the Borrower and the Lender will be bound by, and comply with, all terms and provisions thereof, as amended by this Agreement.

**10. Borrowers Agreement to Assist With Lost, Misplaced, Misstated, Inaccurate or Missing Documents**

In consideration of this Modification, the Borrower agrees that if any document related to the Note and Security Instrument and/or Modification is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, the Borrower will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the original promissory note is replaced the Lender hereby indemnifies the Borrower(s) against any loss associated with a demand on the original note. All documents the Lender requests of the Borrower shall be referred to as "Documents." The Borrower agrees to deliver the Documents within ten (10) days after receipt by the Borrower of a written request for such replacement.

As evidenced by their signatures below, the Borrower and the Lender agree to the foregoing.

_Beverly Mullings_      Dated: 2/26/09

BEVERLY MULLINGS

STATE OF New Jersey

COUNTY OF Bergen

On 2/26/2009 before me, Nader Ghoulal, Notary Public, personally appeared Beverly Mullings

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signatures (s) on the instrument the person(s), or entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Signature_

NADER S GHOUIAL
Notary Public
State of New Jersey
My Commission Expires Jun 23, 2010

---

Countrywide Home Loans Servicing LP

By: _____      Dated: _____

STATE OF _____

COUNTY OF_____

On _____ before me, _____ Notary Public, personally appeared

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signatures (s) on the instrument the person(s), or entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
**Signature**

UNOFFICIAL

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

# EXHIBIT "D"

MARYANNE MORSE, CLERK OF CIRCUIT COURT
SEMINOLE COUNTY
BK 07000 Pg 1680; (1pg)
CLERK'S # 2008061894
RECORDED 05/29/2008 09:14:19 AM
RECORDING FEES 10.00
RECORDED BY G Harford

## ASSIGNMENT OF MORTGAGE

SPACE FOR RECORDING ONLY F S §495.25

FOR VALUE RECEIVED, on or before April 09, 2008, the undersigned, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED, AS NOMINEE FOR COUNTRYWIDE HOME LOANS, INC., ("Assignor") assigned, transferred and conveyed to: THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATE HOLDERS CWABS,INC. ASSET-BACKED CERTIFICATES, SERIES 2006-23, ("Assignee") whose address is 7105 Corporate Drive PTX-C-35 , Plano, TX 75024, its successors and/or assigns, all of the right, title, and interest of Assignor in and to that certain Mortgage (the "Mortgage") dated October 18, 2006 and recorded November 20, 2006 in Official Records Book 6490 at Page 634 of the public records of SEMINOLE County, Florida, encumbering the following-described real property:

LOT 34, TIMACUAN UNIT 17, ACCORDING TO PLAT THEREOF AS RECORDED IN PLAT BOOK 41, FAGE(S) 89 AND 90, OF THE PUBLIC RECORDS OF SEMINOLE COUNTY, FLORIDA.

as the same may have been amended from time to time; together with the Note and indebtedness secured thereby.

MORTGAGOR(S): BEVERLY MULLINGS

IN WITNESS WHEREOF, Assignor has executed and delivered this Instrument on MAY 1 8 2008 , 2008.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED, AS NOMINEE FOR COUNTRYWIDE HOME LOANS, INC.

By: _____

Typed Name: CHAD MOSLEY – ASSISTANT VICE PRESIDENT
Title: _____

Attest: _____

Typed Name: ELY HARLESS, VICE PRESIDENT
Title: _____

(Affix Corporate Seal)

STATE OF TEXAS
COUNTY OF COLLIN

BEFORE ME, the undersigned, personally appeared CHAD MOSLEY and ELY HARLESS as ASSISTANT VICE PRESIDENT and VICE PRESIDENT respectively, and known to me to be the persons that executed the foregoing instrument, and acknowledged that they executed the foregoing as its duly authorized officers and that such execution was done as the free act and deed of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED, AS NOMINEE FOR COUNTRYWIDE HOME LOANS, INC. this _____ day of MAY 1 8 2008 , 2008.

_____
Notary Public:
My commission expires:

Meagan Mackey
Notary Public, State of Texas
My Commission Expires:
August 8, 2009

Recording requested by, prepared by and return to:
Saul Jimenez
Florida Default Law Group, P.L.

FILE_NUMBER

## *F08029051*          *M001100*

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

# EXHIBIT "E"

## The Bank of New York Mellon (FDIC # 639)

### Active Insured Since January 1, 1934

**Data as of:** November 18, 2018

#### The Bank of New York Mellon is an active bank

| | |
|---|---|
| **FDIC Certificate#:** | **639** |
| **Headquarters:** | 240 Greenwich Street<br>New York, NY 10007<br>New York County |
| **Locations:** | 9 domestic in 4 states,<br>0 in territories, and 14 in foreign locations |
| **Established:** | January 1, 1851 |
| **Insured:** | January 1, 1934 |
| **Bank Charter Class:** | Member of the Federal Reserve System |
| **Primary Federal Regulator:** | Federal Reserve Board |
| **Secondary Federal Regulator:** | Consumer Financial Protection Bureau |

**Corporate Website:**
http://www.bnymellon.com

**Consumer Assistance:**
http://www.FederalReserveConsumerHelp.gov

**Contact the FDIC about:**
The Bank of New York Mellon

Locations   **History**   Identifications   Financials   Other Names / Websites

### Showing 1 to 4 of 4 entries (filtered from 12 total entries)

| Date | Event |
|---|---|
| 1/1/1851 | Institution established: Original name:Irving Trust Company (639) |
| 10/7/1969 | Changed name to **The Bank of New York** (639) |
| 7/1/2008 | Moved bank headquarters from NEW YORK CITY, NY to NEW YORK, NY |
| 7/1/2008 | Changed name to **The Bank of New York Mellon** (639) |

**Information as of:** November 15, 2018

There is a new version of this site available. Please visit the <u>work in progress site</u>.



| NIC Home | Institution Search | USBA Search | HCs > $10B |
|---|---|---|---|
| BHCPR Peer Reports | Other Reports | FAQ | |

**Institution History for** <u>BANK OF NEW YORK MELLON, THE (541101)</u>

5 institution history record(s) found.                    < Previous  Page 1 ∨ Next >

| Event Date | Historical Event |
|---|---|
| 1784-01-01 | BANK OF NEW YORK, THE located at 48 WALL STREET, NEW YORK, NY was established as a State Member Bank. |
| 1998-06-29 | BANK OF NEW YORK, THE **moved** to ONE WALL STREET NEW YORK, NY. |
| 2006-03-31 | BANK OF NEW YORK, THE **moved** to ONE WALL ST NEW YORK, NY. |
| 2008-07-01 | BANK OF NEW YORK, THE was **renamed** to BANK OF NEW YORK MELLON, THE. |
| 2015-10-01 | BANK OF NEW YORK MELLON, THE **moved** to 225 LIBERTY STREET NEW YORK, NY. |

Page 1 of 1

<u>NIC Home</u> | <u>FAQ</u> | <u>Help</u> | <u>Contact Us</u>

UNOFFICIAL

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

# EXHIBIT "F"

### LIMITED POWER OF ATTORNEY

The Bank of New York Mellon F/K/A The Bank of New York ("The Bank of New York Mellon"), with offices located at 240 Greenwich Street, 7 East New York, New York, not in its individual or banking capacity, but solely in its capacity as Indenture Trustee or Trustee ("the Trustee") for the trusts identified in Exhibit A hereto (the "Trusts") constitutes and appoints Carrington Mortgage Services, LLC, its true and lawful attorneys-in-fact and agents, with full powers of substitution and resubstitution, for and in its name, place and stead, in any and all capacities, for the limited purpose of executing and recording any and all documents necessary to effect with respect to any Mortgage Loan or Mortgage as such terms are defined herein, (i) an assignment, including procurement, preparation, completion, and execution of the assignment, an assumption agreement or modification agreement or supplement to the Mortgage Loan, including where necessary and appropriate the subordination of the lien of the Mortgage, (ii) the subordination of the lien of the Mortgage to an easement in favor of a public utility company or a government agency or unit with powers of eminent domain, (iii) the demand for, suit for, recovery of, collection of and receipt of each and every sum of money, debt, account and interest (which now is or hereafter shall become due and payable) belonging to or claimed by The Bank of New York Mellon in respect of the Mortgage Loan and property, including foreclosure, (iv) a reconveyance, deed of reconveyance or release or satisfaction of the Mortgage Loan or such instrument releasing the lien of the Mortgage, (v) the closing of title to property acquired by foreclosure or by deed in lieu of foreclosure, and the conveyance of such property to the mortgage insurer or to real estate owned ("REO Property"), (vi) the disposition of any REO Property, and (vii) the defense of The Bank of New York Mellon in litigation and the resolution of any litigation where Carrington Mortgage Services, LLC has an obligation to defend The Bank of New York Mellon -- in connection with those notes and mortgages or deeds of trust (each, a "Mortgage," and together with the related note, a "Mortgage Loan") serviced by Carrington Mortgage Services, LLC for The Bank of New York Mellon in its capacity as Trustee for the Trusts pursuant to the related pooling and servicing agreements. The undersigned also grants unto said attorneys-in-fact and agents, and each of them, the full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as might or could be done in person to effect items (i) through (vii) above and as required by any laws or regulations governing such actions, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them, or their substitutes, may lawfully do or cause to be done by virtue hereof.

This Limited Power of Attorney is effective as of the date hereof and until the earlier of (i) two (2) years from the date hereof or (ii) revocation by The Bank of New York Mellon. The authority granted to the attorney-in-fact by this limited power of attorney is not transferable to any other party or entity. The relationship of The Bank of New York Mellon and Carrington Mortgage Services, LLC under this Limited Power of Attorney is intended by the parties to be that of an independent contractor and not that of a joint venturer or partner.

This limited power of attorney shall be governed by, and construed in accordance with, the laws of the State of New York without regard to its conflicts of law principles.

*[Remainder of page intentionally left blank]*

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

IN WITNESS WHEREOF, The Bank of New York Mellon has executed this Limited Power of Attorney this 18th day of November, 2020.

The Bank of New York Mellon fka The Bank of New York, not in its individual or banking capacity, but solely in its capacity as Indenture Trustee or Trustee

Witness: _____
Ravenn Haynes

By: _____
Loretta A. Lundberg
Managing Director

Witness: _____
Rafal Bar

By: _____
Philip Reinle
Vice President

## ACKNOWLEDGEMENT

STATE OF: NEW YORK
COUNTY OF: NEW YORK

On the 18th day of November in the year 2020, before me, the undersigned, a Notary Public in and for said State, personally appeared Loretta A. Lundberg, Managing Director and Philip Reinle, Vice President, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed, the instrument

Subscribed and sworn before me this 18th day of November 2020,

_____
Notary Public

My Commission expires

TATIANA TEREHOVA
Notary Public, State of New York
No. 01TE6379856
Qualified in Kings County
Commission Expires August 27, 2022

The Bank of New York Mellon Limited Power of Attorney to Carrington Mortgage Services LLC          Page 2 of 4

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

## SCHEDULE A

| No. | Covered Trusts |
|-----|----------------|
| 1. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2005-9 |
| 2. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2005-13 |
| 3. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2006-2 |
| 4. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2006-3 |
| 5. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2006-5 |
| 6. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2006-19 |
| 7. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2006-23 |
| 8. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2006-BC4 |
| 9. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2006-SPS2 |
| 10. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2007-12 |
| 11. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2007-BC3 |

DocuSign Envelope ID: B43F24E6-973A-4F96-ACB4-45815BA7823B

| | |
|---|---|
| 12. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2004-5 |
| 13. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2004-12 |
| 14. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2004-13 |
| 15. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2004-S1 |
| 16. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2005-1 |
| 17. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2005-6 |
| 18. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2005-7 |
| 19. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2005-14 |
| 20. | THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2006-6 |